UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────

GARY GALLETTA,

                                        Plaintiff,

            - against -                                                5:04-CV-0313

VALMET, INC.,

                                        Defendant.

───────────────────────────────────────────

APPEARANCES                                      OF COUNSEL

MEGGESTO CROSSETT & VALERINO, L.L.P.             James A. Meggesto, Esq.
**Attorneys for Plaintiff**
313 East Willow Street - 201
Syracuse, New York  13203

THELEN REID & PRIEST, L.L.P.                     David L. Kelleher, Esq.
**Attorneys for Defendant**                      (Pro Hac Vice)
701 Eighth Street, N.W., Suite 800
Washington, D.C.  20001-3721
            and
875 Third Avenue, 10th Floor                     Thomas P. Lane, Esq.
New York, New York 10022-6225                    (New York Counsel)

**NORMAN A. MORDUE, Chief Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        The present diversity action is one arising under New York products liability law.[1]  On

June 11, 2003, plaintiff suffered serious injuries while working on a paper winder machine in

the course of his employment at Solvay Paperboard in Syracuse, New York.  The paper

─────────────────

[1]

Plaintiff commenced this action in New York State Supreme Court for the County of
Onondaga by service of a summons with notice.  Defendant removed the case to this District
on March 23, 2004, based on diversity jurisdiction pursuant to 28 U.S.C. § 1441.  On June 9,
2004, plaintiff filed his complaint.

winder machine was manufactured and distributed by defendant Valmet, Inc., now known as Metso Paper USA, Inc..  Plaintiff stated three causes of action in the complaint: 1) strict liability; 2) negligence; and 3) breach of warranty.  Defendant moves for summary judgment on all three causes of action.

## II.   FACTUAL BACKGROUND

The undisputed facts as gleaned from the parties' respective Local Rule 7.1 Statements and evidentiary references therein are as follows:  At the time of his accident, plaintiff was working on a PM1 Winder Rider Roll ("Winder") machine used in connection with Solvay Paperboard's Paper Machine No. 1 which produces rolls of finished Linerboard Grade Paper that are up to ten feet in diameter and over fifteen feet wide.  The Winder is located at the end of Solvay Paperboard's production line and its function is to reduce the size of a roll of finished paper to more easily managed sized rolls of paper for shipment to and use by Solvay Paperboard's customers.

Plaintiff was injured when he was assisting his co-worker and mentor/trainer, James Gallagher, prepare the Winder for a paper splice.[2]  This was the first time plaintiff had assisted in a splicing operation as opposed to simply observing one.  The splicing procedure was necessary because the Winder crew observed "blemishes," or visual imperfections on the paper that was being processed through the Winder that needed to be removed.  In order to

---

[2]

The paper splice procedure occurs after a crew operating the Winder is required to manually remove defective or unwanted paper from the paper roll.  Following removal of the paper, the crew then splices together the paper to continue the winding process.  At the time of plaintiffs accident, Gallagher's plan was to clean the machine, shut the machine down for the day and leave the splicing procedure for the next shift.

remove the defective paper, the Winder crew stopped the Winder and lowered the "cradle."[3]
As plaintiff and Gallagher were preparing the Winder for the splicing procedure, a piece of
loose paper fell into the area of the nip point.  Plaintiff then reached to grab the paper and his
hand was caught in the nip.[4]  When asked about reaching for the loose paper during his
deposition, plaintiff testified as follows:

> Q:     When you were performing this function, you knew the nip
>        plate [sic] was there, right?
>
> A:     Correct.
>
> Q:     You knew it was hazardous?
>
> A:     Yeah.  I'm not so sure I knew how hazardous, but I knew
>        it was there, yes.
>
> Q:     You knew not to reach in there on purpose?
>
> A:     Yes; I knew not to do that on purpose, yes.

Later in his deposition, plaintiff again testified about his prior knowledge of the dangers of
reaching into the nip point area:

> Q:     Well, I'm asking you, had you been told not to reach for

---

[3]

The cradle serves, *inter alia*, as a barrier guard preventing access to the nip point formed by
the paper roll and front winder drum during Winder operations.  The nip point is necessary to
the function of the Winder as it is the contact point for the rotating front drum that turns the
paper roll and winds the paper.  When the cradle is lowered to permit access to the paper roll,
the speed mechanisms in the Winder are limited.

[4]

At plaintiff's feet, running along the length of the lowered cradle approximately four inches
off the cradle floor, was a cable-activated emergency stop.  Plaintiff admits that an operator,
by stepping on the cable or lifting the cable with his foot, can thereby stop the Winder.  In this
case, however, plaintiff testified that at the time of accident, although he believed he grabbed
the de-activation cable, the Winder did not stop immediately.

> paper going into the nip?
>
> A:    I have not been told that.
>
> Q:    Did you understand that you should not do that?
>
> (objection by defense counsel)
>
> A:    Yes, I understand I shouldn't do that.  I have been told a lot
> of things not to do, but they just happened.

As a result of the accident, plaintiff suffered injuries to his left hand, neck and right shoulder as well as crushing injuries to his right upper extremity from the fingertips to just below the elbow, including partial amputation of his right thumb.

Plaintiff began working at Solvay Paperboard in September 2000, as an inbound paper technician in which capacity he unloaded corrugated cardboard bales from trucks and fed them into a pulper conveyer.  After sixteen months, he was promoted to an outbound paper technician which required him to remove finished paper rolls from the conveyor, inventory them or prepare them for shipment to customers.  In April 2003, plaintiff became a paper winder assistant technician in training.  Before plaintiff began working on the Winder in his new position as winder assistant technician in training, he had read 60 to 100 safety and training manuals or chapters and was required to pass tests on them.  Plaintiff estimated that 25-30 of these chapters related specifically to the Winder.  Although he had experience working in and around nip points in the plant in his positions as an inbound and outbound paper technician, the 25-30 training and safety manuals he read prior to starting his training as a winder assistant technician instructed him, *inter alia*, on nip points specific to the Winder.[5]

---

[5]

Solvay Paperboard's Academic Training Manual emphasized the need to follow the warning signs affixed to the Winder, providing:

4

On plaintiff's first day working at the Winder, Solvay Paperboard's Safety Manager Jeff Locke gave him a safety tour of the Winder and showed him the Winder's nip points, including the nip point at issue in this case.  Plaintiff admits he was "roughly" aware of the nip points on the Winder prior to his safety tour by Locke through job safety training provided by OSHA.  However, on the day he started working on the Winder machine, Locke specifically told plaintiff the nip points were hazardous and to be cautious when near them.  Plaintiff testified that Locke "walked [him] through the entire paper machine from the front side to the back side ... and then back through the [W]inder to discuss the various safety concerns with the machine."[6]  Nip points, the hazards of nip points and the need to keep clear of nip points, were items also covered in team training meetings attended by plaintiff.  James Gallagher, plaintiffs co-worker and trainer at the time of the accident, also warned plaintiff of the hazards of the Winder's nip points.  Indeed, Gallagher showed plaintiff where the nip points were located and instructed him not to put his hands or clothes into the nip points.[7]

_____

• The winder is equipped with safety signs. Observe them all.

Solvay Paperboard's Academic Training Manual also specifically warned plaintiff of this nip point, as follows:

• Be aware of the nip of the front drum and building rolls or cores.

[6]

Specifically in connection with the Winder, Locke pointed out nip points on the Winder's "drums, the roll itself when they met the drums" as well as "[n]ip points [which] were on the edges of the parent reel, which was the big reel you saw going into the smaller reels" and finally, nip points "[i]n the area of the cradle when the cradle was going up and down."

[7]

Defendant has submitted testimonial as well as photographic evidence in support of its claim that nip point warning signs were also physically affixed to the Winder at the time of plaintiff's accident.  According to defendant, these warnings show the hazard of the nip point

5

In the accident/incident report prepared by Solvay Paperboard after plaintiff's injury, Chris List categorized the cause of plaintiffs injury as: "Unsafe Act/Carelessness."  In Solvay Paperboard's injury report, Leon Meeks, the Shift Team Coordinator wrote: "Grabbing for a piece of loose paper, into a moving nip.  I just don't get it.  That is not what they are taught, and we all know better not to do it."  Meeks checked off the box entitled "Lack of Knowledge/Training" as the "root cause" of the accident.  In a comment to Meeks' report, another supervisor, Barry Cunningham, wrote:

> I do not think we should say lack of training or knowledge since we agree that this action is absolutely discouraged.  I am sure Gary has been told that you do not reach for paper going into the nip, but that was done anyway as an instinct that we have yet to eliminate.  This is a prime example of behavioral action, obviously negative.  Personally, I had spoken to Gary within the past two

---

in a visual depiction and with the words: "Danger. Stay Clear of Nip."  In his affidavit submitted in opposition to defendant's motion, plaintiff states that "none of [these warning signs] . . . were present at any time prior to [his accident.]"  In his deposition taken in July 2005, plaintiff testified on the issue of prior notice of the warning signs as follows:

> Q.    Tell me, if you recall, that before your accident there were warning signs on the machine that pointed out the nip points?
>
> A.    I do not remember the warning signs.
>
> Q.    Do you recall a sign in the middle of the machine as you look at it from the cradle slightly above what would be the front drum, it says nip point?
>
> A.    I do not remember.
>
> Q.    The reason I ask you, I saw them this morning.
>
> A.    Right.
>
> Q.    Did you seem[sic] them this morning?
>
> A.    I wasn't looking too closely.

6

> weeks and discussed the winder 2 incident of Terry Whitten[8] and
> how we must avoid those actions that caused his injury. Again, I
> feel like I am missing the skill that instills safe behavior and
> actions/decisions that are made by other people. What are we
> missing??? We have repeated a serious injury at a higher level.
> How do we stop this from the next level???

At his deposition, plaintiff did not recall speaking with Barry Cunningham about safety or about Terry Whitten's accident.

## III.    DISCUSSION

### A.    Applicable Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant

---

[8]

Prior to the time plaintiff began training as a winder assistant technician, another Solvay Paperboard employee, Terry Whitten, was injured while working near the Winder on Paper Machine No. 2. Plaintiff was aware of the injury to Whitten, but testified that Whitten had been working on a smaller roll of paper at the time of his accident and returned to work the next day. Although plaintiff had seen the accident report, and knew Whitten had been performing a splicing procedure at the time of his accident, he did not know exactly how Whitten's injury occurred.

meets this initial burden, the nonmoving party must demonstrate that there is a genuine

unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). Although all inferences must be drawn in

favor of the nonmoving party, mere speculation and conjecture is insufficient to preclude the

granting of the motion. *Western World Ins. Co. v. Stack Oil*, 922 F.2d 118, 121 (2d Cir.

1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

(holding that nonmoving party must do more than merely show "some metaphysical doubt" as

to material facts to escape summary judgment). It is with these considerations in mind that the

Court addresses defendant's motion for summary judgment.

B.    Applicable Substantive Law

Plaintiff asserts both a claim for negligence and strict liability. The latter claim for

strict liability has two components-design defect and failure to warn. As an initial matter, the

Court notes that the question of whether these two causes of action are substantively similar

remains unsettled. While New York courts generally consider design defect and negligence

claims "functionally synonymous," *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258 (1995), the

Second Circuit has construed this characterization as "dicta," and therefore continues to view

this aspect of products liability law in New York as unsettled. *Jarvis v. Ford Motor Co.*, 283

F.3d 33, 63 (2d Cir. 2002), *cert. denied*, 537 U.S. 1019 (2002). Nonetheless, because Plaintiff

must essentially make out the same *prima facie* case under both theories, the Court will

analyze the claims together after discussing the governing legal principles. *See, e.g., Benner

v. Becton Dickinson & Co.*, 214 F.R.D. 157, 164-65 (S.D.N.Y. 2003).

1.    Negligence

To make out a *prima facie* case for negligence in New York, plaintiff must show: (1)

that the manufacturer owed him a duty to exercise reasonable care; (2) breach of that duty so that a product is rendered defective, i.e., reasonably certain to be dangerous; (3) that the defect was the proximate cause of plaintiff's injury; and (4) loss or damage. *See, e.g., McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997).

2.      Strict Liability

        "As the law of strict products liability has developed in New York, a plaintiff may assert that the product is defective because of a mistake in the manufacturing process or because of improper design or because the manufacturer failed to provide adequate warnings regarding the use of the product." *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106-07, (1983) (citations omitted).  Of the three types of products liability theories recognized under New York law, plaintiff's complaint asserts that the Winder suffered from a design defect and an inadequate warning.  With respect to either or both theories, plaintiff must proffer evidence that the alleged design defect or inadequate warning was the proximate cause of his or her injury. *See McCarthy*, 119 F.3d at 154.

a.      Design Defect

        To establish strict liability for a defective product design, a plaintiff must demonstrate that "(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." *G.E. Capital Corp. v. A.O. Smith Corp.*, No. 01 Civ. 1849 LAP, 2003 WL 21498901, at *4 (S.D.N.Y. July 1, 2003) (citation omitted); *Voss v. Black & Decker Mfg. Co.* ., 59 N.Y.2d 102, 108 (1983).  With respect to the first factor, "[t]he plaintiff ... is under an obligation to present evidence that the product, as designed, was not reasonably safe

9

because there was a substantial likelihood of harm and it was feasible to design the product in a safe manner." *Voss*, 59 N.Y.2d at 108.  Courts have recognized that "some products, for example knives, must by their very nature be dangerous in order to be functional." *McCarthy,* 119 F.3d at 155 (citing *Robinson v. Reed-Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 479 (1980)).  "There must be something wrong with the product, and if nothing is wrong there will be no liability." *Id.*

Second, plaintiff is required to prove the existence of a feasible alternative design that would have prevented the accident.  *Rypkema v. Time Mfg. Co.*, 263 F.Supp.2d 687, 692 (S.D.N.Y. 2003) (citing *Voss*, 59 N.Y.2d at 108).  A plaintiff can satisfy this burden in two ways: (1) plaintiff's expert can demonstrate, through testing and construction of a prototype, that such an alternative is feasible, practical, economical and safe; and/or (2) plaintiff's expert can identify manufacturers of similar equipment that have put the proposed design into use. *See Brooks v. Outdoor Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000); *see also Colon ex. Rel Molina v. BIC USA, Inc.*, 199 F.Supp.2d 53, 77 (S.D.N.Y. 2001).

Third, and finally, the plaintiff must show that the defective design was the proximate cause of his injury.  *See Robinson*, 49 N.Y.2d at 479.  Because an accident may have "more than one proximate cause," the test is whether defendant's defective or unreasonably dangerous design can be shown to be a "substantial cause" of the injury.  *Bush v. Lamb-Grays Co.*, 246 A.D.2d 768, 771 (N.Y.A.D. 3d Dep't 1998).

Ultimately, the inquiry in a design defect case "requires a fact finder to make a judgment about the manufacturer's judgment" in choosing to design a product in a certain way.  *Denny,* 87 N.Y.2d at 258.  Therefore, courts have analyzed negligence and strict liability

claims for design defect under a single test:  Plaintiff bears the burden of presenting evidence that (1) the product as designed posed a substantial likelihood of harm, (2) a feasible alternative existed, and (3) the defective design caused plaintiff's injury.  *See Kass v. West Bend Co.*, 2004 WL 2475606, at *12 (E.D.N.Y. Nov. 4, 2004); *Voss*, 59 N.Y.2d at 107-08.

Plaintiff has not submitted testimony or an affidavit by any expert concerning product defects in this case.  The Court's Uniform Pretrial Scheduling Order required the parties to disclose the identity of any experts and exchange any expert reports by May 31, 2005.  In addition, the Order provided that all discovery must be completed on or before August 30, 2005.  To date, plaintiff has not disclosed the identity of any expert witness or provided any expert written reports to defense counsel.  Absent the required expert testimony, all that is before this Court is plaintiff's claim that the Winder was unreasonably dangerous, that it was designed defectively and that this defective design was the cause of his injuries.  However, the arguments of plaintiff and his counsel are not evidence.  There is simply no competent proof, expert or otherwise, that the Winder was not reasonably safe or that plaintiff's injury could have been avoided if the machine was designed differently.  Accordingly, defendant is entitled to summary judgment on plaintiff's negligence claim as well as the strict products liability claim based on design defect.

b.      Failure to Warn

Plaintiff's failure to warn case suffers from a similar defect.  A plaintiff asserting a failure to warn must establish that: (1) a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of the harm.  *Burke v. Spartanics, Ltd.* 252 F.3d 131,

139 (2d Cir. 2001).  "A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." *Liriano v. Hobart Corp*., 92 N.Y.2d 232, 237 (1998).

In the present case, defendant has submitted photographs of warnings affixed to the Winder which it asserts satisfied its duty to warn plaintiff of the dangers associated with the Winder's nip point.  Jeffrey Locke from Solvay Paperboard, testified that "to the best of [his] knowledge," these warning signs were posted on the Winder's frame at the time of plaintiff's accident.  Plaintiff testified at his deposition that he "d[id] not remember" the warning signs. He now states in an affidavit in opposition to defendant's motion that the warning signs were never there.  It is well-settled that a party may not create a factual issue precluding summary judgment by offering an affidavit that contradicts previous sworn testimony.  *See Langman Fabrics v. Graff Californiawear Inc*., 160 F.3d 106, 112 (2d Cir. 1998) (citing *Mack v. United States*, 814 F.2d 120, 124-25 (2d Cir. 1987) and *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc*., 925 F.2d 566, 572 (2d Cir. 1991)).  Defendant contends that the Court should not consider plaintiff's eleventh hour attempt to avoid summary judgment by submitting an affidavit which changes his prior testimony.  The Court agrees that stating that one does not remember whether something was present is different than stating that something was never there to begin with.  Thus, the portion of plaintiff's affidavit wherein he attempts to negate his earlier assertion that he "did not remember" the warning signs must be rejected.  Likewise, the Court is not persuaded by plaintiff's suggestion that Barry Cunningham's use of the phrase "What are we missing?" suggests that warning signs regarding the nip point were absent from the Winder at the time of his accident.  Plaintiff's inability to remember whether warning

12

signs were affixed to the Winder is not sufficient to create a triable issue over the existence of warnings defendant avers were present at the time of plaintiff's accident.

"Once a warning is given, the focus shifts to the adequacy of the warning.... [New York] courts have required ... that warnings must clearly alert the user to avoid certain unsafe uses of the product which would appear to be normal and reasonable." *Cooley v. Carter-Wallace Inc*., 102 A.D.2d 642, 646 (4th Dep't 1984) (citations omitted).  There are two situations in which a manufacturer of a product has no duty to warn of known or foreseeable dangers.  First, a manufacturer has no duty to warn users of a product of its dangers if they are obvious or well known.  *See Burke*, 252 F.3d at 137.  Second, "when the user is fully aware of the nature of the product and its dangers, ... the manufacturer cannot be held liable for failure to warn him." *Billiar v. Minnesota Mining and Mfg. Co.*, 623 F.2d 240, 243 (2d Cir. 1980).  In this case, defendant asserts that the danger of the Winder's nip point was obvious, particularly to plaintiff who had been specifically trained and advised to avoid the nip point which caused his accident.

Plaintiff's attorney argues that plaintiff did not fully appreciate the danger associated with the nip point.  To wit, plaintiff's counsel avers that plaintiff was assisting in the performance of a splicing procedure for the first time when he was injured.  In addition, counsel highlights the portion of plaintiff's deposition wherein he stated he was only "roughly" aware of the hazards associated with the nip point.  It is clear that in context, plaintiff's testimony was that he was only "roughly" aware of the dangers of the Winder's nip point **before** his personal safety tour of the Winder with Jeff Locke during which each of the nip points and hazards of the Winder were expressly pointed out to him.  Notably, while his

13

attorney argues that the warning signs should have explicitly stated that one should not reach for paper going into the winder, plaintiff himself does not aver nor did he testify or present evidence that a more detailed warning would have prevented his accident.

Indeed, plaintiff was explicitly aware of the hazard of the nip point on the Winder. And although he said he was "not so sure [he] knew how hazardous" the nip point was before his accident, he testified that he knew the nip point was there, he "knew" it "was hazardous," he knew he "should not reach" into the area of the nip point "on purpose," and he "underst[ood]" he should not "reach for paper" going into the nip point. To wit, he admitted, "I have been told a lot of things not to do, but they just happened." Thus, even if, as plaintiff's attorney suggests, the warning sign affixed to the Winder had specifically noted the danger of reaching into the nip point area for a loose piece of paper, plaintiff already knew at the time of his accident that he should not reach for paper going into the nip point and yet, he did it anyway. See *Liriano,* 92 N.Y.2d at 247 ("[W]hen a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning."); *see also Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir. 1991).

Plaintiff is ultimately obligated to demonstrate that the alleged inadequacy of warnings on the Winder was the proximate cause of his accident. *See Burke*, 252 F.3d at 139 ("But of course a defendant's liability will not arise from a breach of duty [to warn] alone. Instead, the plaintiff must show, in addition, that 'the failure to warn [was] a substantial cause of the events which produced the injury.'") (citing *Billsborrow v. Dow Chem.*, 177 A.D.2d 7, 16 (2d Dep't 1992)). In *Burke*, a worker who lost the fingers of his right hand sued a metal shearing

machine manufacturer alleging failure to warn of the danger of placing a hand in the rear cutting plane of the machine.  However, the court found that the plaintiff was explicitly aware of the risk associated with placing his hand in this area.  Thus, the court determined that failure to warn was not the proximate cause of accident since and the instructional error on duty to warn was harmless.  *See* 252 F.3d at 140-41.  While the *Burke* plaintiff's undisputed awareness of the risk of placing his hand in the area of the cutting plane did not negate the defendant's duty to warn in that case, it did ultimately "fully negate any causal connection between the absence of a [] warning and his injuries."  *See, Burke*, 252 F.3d at 140 (citing *Smith v. Stark*, 67 N.Y.2d 693, 694 (1986) (finding no causation because plaintiff must have known based on his "general knowledge of pools, his observations prior to the accident, and plain common sense ... that, if he dove into the pool, the area into which he dove contained shallow water"); *McMurry v. Inmont Corp*., 264 A.D.2d 470, 472 (2d Dep't 1999) (holding that, given plaintiff's experience and training, "a warning would not have added anything to the appreciation of this hazard")).

Defendant correctly cites *Liriano*, 92 N.Y.2d at 241, for the proposition that no duty to warn arises where an injured party has actual knowledge of the hazard, where the hazard is patently dangerous or posed where it posed open and obvious risks.  The subjective knowledge envisioned by *Liriano* is the "injured party's **actual** knowledge of the specific hazard that caused the injury."  92 N.Y.2d at 241 (emphasis added).  In the context of summary judgment, when the nonmoving party will bear the ultimate burden of proof at trial, the moving party's burden is satisfied if it can point to an absence of evidence to support an essential element of the nonmoving party's claim.  *See Celotex*, 477 U.S. at 322-23.

15

In this case it is undisputed that plaintiff was a novice insofar as performing or assisting in the paper splicing procedure involved in his accident.  There is also a suggestion in the record that plaintiff's inexperience and/or lack of knowledge was the cause of his failure to avoid contact with the nip point of which he was indisputably keenly aware.  Specifically, in the injury report prepared by Leon Meeks, "lack of knowledge/training" was noted as the cause of the accident.  Although plaintiff himself did not testify about or present evidence concerning what additional knowledge, training or warnings would have prevented his accident, the Court cannot say that defendant has excluded all possibility that plaintiff might proof his claim as a matter of law.  In *Burke,* however, the court explicitly noted that the case under review was **not** a case "in which a plaintiff, though fully apprised of a machine's dangers, simply forgot to take care in the course of using the machine for the first time."  252 F.3d at 140.  Had "such circumstances" existed, the court might have found that "a reminder could avert an accident."  *Id.*[9]  The Court is thus constrained to find that a material question exists, however thin, concerning the sufficiency of the warning plaintiff received about working in and around the nip point.  "[R]easonable minds might disagree as to the extent of plaintiff's knowledge of the hazard, " *Brady v. Dunlop Tire Corp.*, 275 A.D.2d 503, 505 (3d Dep't 2000), and the question is therefore one for a jury.

3.     Breach of Warranty

Under New York Law, section 2-725 of the Uniform Commercial Code governs causes of action for breach of implied warranty for the sale of goods.  *See Chase Manhattan Bank,*

---

[9]

In *Burke*, however, the shearing machine had no affixed warnings unlike the Winder in the case *sub judice*.

*N.A. v. T & N PLC*, 905 F. Supp. 107, 112 (S.D.N.Y. 1995); *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 410(1985).  Section 2-725 mandates that a claim for breach of implied 64 warranty must be brought within four years after the cause of action accrued. *See* N.Y. U.C.C. § 2-725; *Heller,* 64 N.Y.2d at 410.  In New York, the law is clear that such a claim accrues at the time the product is delivered.  *Arell's Fine Jewelers, Inc. v. Honeywell, Inc.*, 170 A.D.2d 1013, 1015 (4th Dep't. 1991).  Courts determining the accrual date for breach of warranty claims under New York Law apply the date of tender rule quite rigidly.  *See e.g, Orlando v. Novurania of Am., Inc.*, 162 F.Supp.2d 220, 223-24 (S.D.N.Y. 2001) (citing cases).

In the instant case, it is undisputed that defendant tendered delivery of the Winder to Solvay Paperboard in 1993.  Plaintiff filed this action against defendant in 2004, eleven years after the breach of warranty claim accrued.  Thus, plaintiff's claim for implied breach of warranty is barred by the applicable statute of limitations and must be dismissed.

## IV.    CONCLUSION

In view of the foregoing, defendant's motion for summary judgment is hereby GRANTED in part and DENIED in part; and it is further

ORDERED that plaintiff's claims for negligence, design defect and breach of warranty are hereby dismissed with prejudice; and it is further

ORDERED that defendant's motion to dismiss plaintiff's claim for strict liability based on failure to warn is DENIED.

IT IS SO ORDERED.

Dated: March 30, 2007
       Syracuse, New York

17

Norman A. Mordue
Chief United States District Court Judge

18